## Traveler Rubber Co. v. Bergougnan Rubber Corporation.

*Contracts—Sales—Instalment deliveries—Act of May 19, 1915.*

1. Where a contract for the manufacture and sale of tires of a particular type and standard provides for delivery by monthly instalments, which are to be separately paid for, the purchaser's right of rescission, because of the delivery of defective tires, is not defeated merely because he had received and accepted a large number of tires.

2. The purchaser's right in such case is saved by section 45, sub-division 2 of the Act of May 19, 1915, P. L. 543, which provides that the right of rescission depends on the terms of the contract and the circumstances of each case, and whether the breach of·the contract is so material as to justify the injured party in refusing to proceed further.

3. The seller cannot claim that the purchaser failed to use due diligence in inspecting the tires, where it appears that by the contract the seller agreed to make an adjustment for defective tires on stated mileage basis.

4. The purchaser was not bound to an inspection until there was a resort to the adjustment and a definite refusal to adjust on the part of the seller.

5. Where the purchaser claims that the tire was defective and below the standard provided by the contract by reason of the omission in its manufacture of a wearing strip, his rescission of the contract on that ground cannot be sustained, unless the omission of the strip made the resultant tire not a first grade standard tire.

6. In an action by the purchaser of tires against the seller for failure to repair defective tires sold under a warranty, judgment will be entered for defendant *n. o. v.*, in the absence of evidence showing the damages suffered by plaintiff by reason of defendant's refusal to make the repairs.

Motion on part of the defendant for judgment *n. o. v.* and for a new trial. C. P. No. 5, Phila. Co., March T., 1922, No. 1704.

*Owen J. Roberts,* for plaintiff; *E. Hopkinson,* for defendant.

McPHERSON, P. J., 51st judicial district, specially presiding, March 31, 1924.—The plaintiff company from 1917 until 1921 was a jobber of "Traveler" automobile tires, the patterns and designs of which were originated by it. The defendant, in the fall of 1919, purchased the property and plant of the Delion Rubber Company, which was used in the manufacture by the latter of automobiles tires of various makes and brands, both for itself and for other individuals and corporations, among whom was the plaintiff. The defendant continued this business of manufacturing automobile tires from 1919 to the date of suit.

Under a contract dated Jan. 8, 1917, the Delion Tire and Rubber Company agreed with Guy De La Riguardiere, the president of the plaintiff company, for him or the assignees of this contract, to manufacture "Traveler" tires, the same to be made over dies furnished by Riguardiere or his assignees, and along the same lines and with the same material as were followed and used by the Delion Company in manufacturing its own Delion tires. This contract was assigned to the plaintiff by Mr. Riguardiere.

This agreement also contained a provision whereby the manufacturing company agreed to adjust with the jobbing company all tires which were proved to be defective in workmanship or material, on a 3500-mile basis. Subsequent to this contract, the relations of manufacturer and buyer were continued between the plaintiff company and the Delion Tire and Rubber Company through the year 1918, and in the year 1919 until some time in October.

In October of 1919 the plaintiff company sent an order to the Delion Tire and Rubber Company ordering a certain number of "Traveler" tires. This order was filled by the defendant corporation, who at that time had purchased

the plant and business of the Delion Tire and Rubber Company and was conducting the same at Trenton, N. J. Several small orders were repeated through the remaining months of 1919.

In January of 1920 the plaintiff ordered by letter from the defendant company 5000 "Traveler" tires, of the straight side and clincher types and of various sizes, to be delivered to it in instalments by the defendant company during the year 1920. This order was accepted by the defendant company, and under it the major portion was delivered to the plaintiff company. The provisions for the adjustment of tires that proved to be defective in workmanship or material, on the 3500-mile basis, were recognized by the plaintiff and the defendant as in existence and applicable to this order. The "Traveler" tires, under the original and regular course of dealings between the plaintiff company and the Delion Tire and Rubber Company, were to be constructed along the same lines and with the same materials as were followed and used in the first grade Delion tire. The straight side Delion tire, when the dealings began between the plaintiff and the Delion Tire and Rubber Company, had as a feature of its construction what is termed a "wearing strip," a piece of cotton fabric placed in the shank of the tire, impregnated with the rubber therein and extending thence to the edge of the tire and around the bead, thereby presenting a fabric surface to the iron rim of the automobile wheel on which it was to be placed. Without the knowledge or consent of the plaintiff, the Delion Tire and Rubber Company, sometime during the year 1919, eliminated this wearing strip as a feature of the construction of its own tires and also of the construction of the "Traveler" tires for the plaintiff. This practice was continued by the defendant company after it had purchased the business of the Delion Tire and Rubber Company, still without the knowledge or consent of the plaintiff company. Instead of this wearing strip, the Delion Tire and Rubber Company substituted in the body of the tire sufficient additional rubber to take the place of the fabric of the wearing strip therein, and, in order to present a 'fabric surface on the bead against the rim of the wheel, they continued the outer layer of fabric over the shank of the tire and thence ran it to and over the bead. This change in construction also applied to the "Traveler" tires manufactured by the defendant.

In the spring of 1920 the number of tires which were returned to the plaintiff company as not completing the guaranteed mileage considerably increased, the chief injury thereto being rim cuts. Under the adjustment agreement, these were shipped back to the defendant. Some were adjusted and some were refused adjustment, the result being unsatisfactory to the plaintiff.

These refusals became the subject of correspondence, and with the increasing number of tires returned and the continued refusal on the part of the defendant to adjust, the plaintiff, on or about Aug. 1, 1920, cut open one of the tires manufactured by the defendant and discovered the absence of the wearing strip and the substitution made therefor, as outlined above.

The officers of plaintiff company visited the president of the defendant company within a few days thereafter, to whom complaint was made of the absence of this wearing strip, to which the plaintiff ascribed the largely increased number of rim-cut tires returned to it by its customers. The president of the defendant company promised to investigate the condition and make things right under the adjustment feature of their contract.

After considerable correspondence, which lasted until about Oct. 1, 1920, the defendant company, through its president, took the position that the absence of the wearing strip created no defect in construction, was not the cause of

4 D. & C.

the rim-cut tires, and refused definitely to adjust the tires which were the subject of this dispute.

Within a week after this definite determination on the part of the defendant was communicated to the plaintiff, the latter notified the defendant of the cancellation of the contract, offered to return to the defendant all the tires it had on hand which were manufactured by the defendant, demanded the return of the purchase price of tires already paid for, and directed that their form and dies be delivered to an agent designated by it. The plaintiff company also refused to accept eighty-seven tires which were shipped by the defendant company to the plaintiff company on Oct. 14, 1920, which were then returned by the carrier to the defendant, who subsequently sold them for less than the contract price.

As a result of the situation thus created, the plaintiff subsequently brought suit against the defendant for the recovery of the price of the tires furnished to it by the defendant under the contract prior to its rescission and which had been paid for by the plaintiff.

The defendant in its answer denied any liability therefor to the plaintiff, and, as a counter-claim, demanded from the plaintiff the purchase price of the tires manufactured by it for the plaintiff and delivered to the latter, which were unpaid for; the difference between the contract price of the tires manufactured and tendered to the plaintiff and refused by it and the amount realized therefor at their resale; and for the damage suffered by the defendant from the plaintiff's refusal to receive from the defendant the balance of tires necessary to make up the full amount covered by the original order.

On the trial of the case, the court instructed the jury that under the order of Jan. 8, 1920, the plaintiff was entitled to have manufactured for it by the defendant a standard automobile tire, as well as a tire following the same lines and using the same materials as were followed and contained in the Delion tires. That the jury was to determine, under the evidence, whether or not the absence of the wearing strip and the substitution therefor of the rubber and the additional layer of fabric was an alteration which did or did not change the tire from a standard tire to a non-standard tire. If they found that it did, the plaintiff was entitled to a verdict against the defendant. If they found it did not destroy the standard quality of the tire, the plaintiff had no legal right to rescind the contract and the defendant had no liability to the plaintiff, and, under these circumstances, the rescission of the contract by the plaintiff was unjustifiable and the plaintiff would be responsible in damages to the defendant for the purchase price of the tires delivered, the difference in value between the contract price of the tires tendered and refused and the amount realized therefrom at a subsequent sale, and for the loss of profits which the defendant suffered by reason of the refusal to allow the defendant to manufacture for the plaintiff the full number of the tires called for by the original order. The jury found a verdict in favor of the plaintiff of $5774.95. The defendant thereupon moved for judgment *n. o. v.* and for a new trial.

The defendant urges in support of its motion for judgment *n. o. v.* the following reasons: First. That the plaintiff had no right of rescission, because it had received and used a large number of the tires covered by the contract, and, therefore, could not put the defendant in the position it occupied prior to the contract.

This reason would seem to have merit if the contract in question were a contract wherein there was a full delivery at one particular time, when the full performance on the part of the defendant could have been clearly

judged. In view of the fact that this was a contract for the delivery of a quantity of tires in certain specified monthly instalments, we feel that the right of rescission is not covered by the rule of law relied on by the defendant and exemplified in the authorities cited by it. That the right to rescind an instalment contract of this character is provided for under section 45, subdivision 2, of the Sales Act of May 19, 1915, P. L. 543, which reads as follows: "Where there is a contract to sell goods to be delivered by stated instalments, which are to be separately paid for, and the seller makes defective deliveries in respect to one or more instalments, or the buyer neglects or refuses to take delivery of or pay for one or more instalments, it depends in each case, on the terms of the contract and the circumstances of the case, whether the breach of contract is so material as to justify the injured party in refusing to proceed further and suing for damages for breach of the entire contract, or whether the breach is severable, giving rise to a claim for compensation, but not a right to treat the whole contract as broken."

The plaintiff for at least three years had been building up a business in its particular type and make of tires. It had established many agencies and was preparing to manufacture at its factory in course of construction. The shipment of defective tires as its standard product would have greatly injured, if not destroyed, the business as already organized and built up. Under these circumstances, if the defendant were delivering to the plaintiff tires that were defective and not standard, we feel the plaintiff had a right to rescind the contract and sue for damages suffered if the contract had been breached by defendant. To restrict the plaintiff to a recovery of the difference between the value of the tires actually delivered and to be delivered in full performance of the contract and the value of the type of tires which had been delivered under the contract would be a wholly inadequate measure of damages.

The second reason urged is that the plaintiff failed to use due diligence in inspecting the tires, and thereby lost its right to rescind the contract.

To sustain this, the defendant urges the theory that the increase of the number of tires for adjustment, which began in the spring of 1920 and continued in the summer, because of rim cuts complained of by the plaintiff, put the plaintiff to the duty of prompt inspection of the cause of defect, and the inspection on or about Aug. 1, 1920, and notices subsequent thereto, were too late to justify the rescission of contract.

To support this position, the plaintiff relies upon the case of Wright *v.* General Cabonic Co., 271 Pa. 332, and Crunder Martin Manuf. Co. *v.* Turner, 274 Pa. 425. These authorities would seem to sustain the plaintiff's position as a general proposition, but we are of the opinion that the provision in the contract, whereby the defendant agreed to make adjustment for defective tires on a mileage basis of 3500 miles, resorted to, differentiates this case from the ones covered by the authorities cited, and that the plaintiff was not bound to an inspection until there was a resort to the adjustment provided therein and a definite refusal to adjust was made by the defendant. The prompt notification of the defect given by the plaintiff to the defendant after inspection, and the further negotiations between the plaintiff and the defendant at the suggestion of the defendant, as to the existence or non-existence in the tires of a defect in construction or material, relieve the plaintiff of the charge of lack of due diligence. We believe that plaintiff was within its rights in rescinding the contract, assuming that the condition complained of was a violation of the contract in existence between the parties.

The third reason urged by the defendant is that the plaintiff failed in the absolute duty that it had to investigate at once the cause of complaints and

4 D. & C.

determine whether it would affirm or disaffirm the contract. What we have said in relation to the second reason is applicable to this reason, and we feel neither reason is a basis for the granting of the defendant's motion.

The fourth reason urged is that there was no evidence of any breach of contract on the part of the defendant, because the tires made by the Delion Company for the plaintiff were without a wearing strip and were of the same construction as the tires made by the defendant company; that there was no evidence to prove that there was an express warranty that the tires should contain a wearing strip. And, further, that there was no evidence to show that the absence of the wearing strip created a breach of any implied warranty that the goods were to be merchantable.

Under the original dealings between the plaintiff and the Delion Tire and Rubber Company, the latter was to manufacture for the former a first grade tire, following the same lines and using the same materials as the defendant used in its Delion tire. There was evidence tending to establish that in the construction of the first grade, straight side Delion tire the wearing strip was a necessary feature for the purpose hereinafter referred to, and thus to qualify it as of that grade as understood by the parties. When the plaintiff ordered, in 1920, "Traveler" tires, it had a right to expect from the defendant the manufacture for it of a first grade tire, measured by the original lines followed and materials used in the first grade Delion tire. In order to fulfill this contract, the defendant could not leave out of the manufacture of the "Traveler" straight-side tires any constituent which made the resultant tire a first grade or standard tire. The removal of the wearing strip prior to the order of Jan. 6, 1920, was without the knowledge or consent of the plaintiff company, and such removal was unwarranted on the part of the defendant or the Delion Tire and Rubber Company in relation to their obligation to the plaintiff, unless the strip removed was not essential to make the resultant tire a first grade or standard tire. This is what the court had in mind in its charge to the jury when it said that the defendant was bound to furnish to the plaintiff a standard tire, and if the removal of the wearing strip made the tire not a standard tire, that then the plaintiff was entitled to a verdict. While in the charge the court may not have expressed itself as clearly as possible, yet we feel that the situation as laid before the jury in the charge is in effect the situation as above particularly outlined.

The vital question was whether the omission of the wearing strip made the resultant tire not a first grade standard tire? Was there any evidence on which to submit these questions to the jury? After a careful reading of the testimony, we are of the opinion that there was not.

From the evidence in the case it appeared clearly that the purpose of the wearing strip was to lock in the bead of the rim and to secure the presentation to the iron rim of the automobile wheel of a fabric surface on the bead of the tire, and thus prevent friction, which would result in quick deterioration of the tire itself.

In the tires made by the defendant for the plaintiff under the contract in question, a fabric of a sturdier quality than the one contained in the wearing strip locked in the bead and presented to the iron rim of the automobile wheel its surface when the tire was placed thereon, so that the condition of friction would be the same in the tires furnished by the defendant, whether the wearing strip was in or out. The opinion of the plaintiff's witness, Kuppinger, to the effect that the absence of the wearing strip made this tire a non-standard tire, was based on his experience with the tires without a wearing strip, made by the Globe Tire Company, but in that tire the absence of the

Traveler Rubber Co. *v.* Bergougnan Rubber Corporation.

wearing strip presented to the iron rim of the wheel, not a fabric surface, but a rubber surface, which all witnesses agreed would create friction and disintegration of the tire. In addition, the presence of additional rubber in the body of the tire to take the place of the part of the wearing strip, which was removed therefrom, made the tire a more wearable tire in its body than the body of the tire in which the wearing strip existed.

The other feature of the case which was submitted to the jury was the amount of damage which the plaintiff suffered by reason of the refusal of the defendant to make adjustment on twenty tires from which this wearing strip was omitted and which were damaged by rim cuts, the plaintiff to be allowed damages on this feature of the case only if the jury found that the defendant had breached its contract and that the plaintiff had exercised due diligence in inspection and rescission. The amount of damages to be awarded on this branch of the case was left to the jury to determine under all the evidence.

After a careful survey of the record, we can find no evidence which shows the damage actually suffered by the plaintiff by reason of the defendant's refusal to adjust these tires, and, hence, it was error to leave that question to the jury. Without evidence as to the amount of damage suffered, the jury could do nothing except make the baldest guess as to the same.

In view of the above, we are of the opinion that judgment should be entered in favor of the defendant, notwithstanding the verdict in favor of the plaintiff.

It was admitted by the plaintiff that if a rescission of the contract were not justified, there was due to the defendant the sum of $4220.69, with interest from Nov. 18, 1920. In view of our conclusions above set forth, judgment should now be entered in favor of the defendant, notwithstanding the verdict in the sum of $4960.41, as of May 18, 1923.

In view of the above disposition of this case, it is unnecessary to consider the motion for a new trial or the reasons filed in support thereof, and we hereby dismiss the motion for a new trial. Motion for a new trial is dismissed.

And now, March 31, 1924, let judgment be entered in favor of the defendant for the sum of $4960.41, as of May 19, 1923, notwithstanding the verdict rendered in favor of the plaintiff.